## No. 2613.

## J. T. MELTON *v.* THE STATE.

1. MURDER—MANSLAUGHTER.—The evidence in this case shows clearly that the defendant provoked the difficulty and killed the deceased because of insulting and defamatory language applied by the latter to defendant's daughters, but that he did not do so upon his first meeting with the deceased after being informed of the insulting and defamatory language. *Held*, that the defense of manslaughter, based upon such language, does not arise in the case.
2. SAME—SELF DEFENSE—FACT CASE.—See the statement of the case for evidence *held* not to raise the issue of self defense, and to be sufficient to support a conviction for murder in the second degree.
3. SAME—CONTINUANCE to secure absent testimony is properly refused if, in view of the evidence adduced on the trial, the absent testimony appears not to be probably true.

APPEAL from the District Court of Cass. Tried below before the Hon. W. P. McLean.

This conviction was in the second degree, for the murder of Thomas Braden, in Cass county, Texas, on the twenty-sixth day of April, 1887. The penalty assessed against the appellant was a term of fifteen years in the penitentiary.

Valentine Waites was the first witness for the State. He testified, in substance, that he was present and witnessed the shooting of Thomas Braden by the defendant. The shooting occurred on the morning of April 26, 1887, at or near the "Y" switch of the Texas & Pacific Railway, in Cass county, Texas. The witness was engaged in unloading hay from a box car when the shooting took place. Witness observed the deceased when he drove up to the "Y" switch with his wagon loaded with lumber. About the same time he observed the defendant at the switch with a wagon load of cross ties. The deceased, when he arrived at the switch, proceeded to unload his wagon. He and his wagon were then more than sixty yards distant from the defendant and his wagon. When the witness next observed the defendant, the latter had left his wagon, and was going towards the deceased, carrying his shot-gun with the butt under his arm and the muzzle pointing towards the ground. As the defendant approached the deceased, he said something in a choked, angry voice, which

witness did not understand, and to which the deceased replied: "Don't come about here bothering me at my work." At this time the defendant and deceased were about twelve steps apart, advancing upon each other, the defendant with his gun in his hands, and the deceased with his hands empty and hanging at his sides. At this juncture the witness turned his back to the parties, and presently the gun fired. Witness then looked towards the parties and saw them about fifteen feet apart, both advancing, the defendant still armed with his gun, and the deceased with his empty hands still hanging at his sides. When the two men came together, they clinched, fell and disappeared from the witness's view, behind the deceased's wagon.

Witness then went to the parties and found them on the ground, the deceased on top of the defendant. They were not then making any efforts to hurt each other. A man named Anderson, standing near by, had secured the defendant's gun. The deceased either got off or was dragged off defendant by some one, and the defendant got up, secured his gun from Anderson, and said to deceased: "I would not have shot you if you had not scandalized my girls." Witness then observed that deceased was shot through the thigh, and was bleeding profusely. He was taken from the ground, placed on a litter, and carried to Dick McDuff's house, where he died about three hours later. When the witness first observed the deceased on the morning of the homicide, he was unloading his wagon. He first saw the defendant as the latter drove up to the switch. In going to the switch, the defendant crossed the railroad, passing the deceased at a distance of between sixty and seventy yards. Arriving at the switch, he unloaded his wagon and then drove back across the railroad. When he reached a point about sixty yards distant from the deceased, he stopped his wagon, got off and started towards or in the direction of the deceased. Deceased, on being shot, fell at a point about twenty yards distant from his own wagon, and about forty yards distant from the defendant's wagon. While the parties were on the ground, and the deceased on top of the defendant, the witness observed a pistol, the barrel of which was protruding through a hole in the lining of the deceased's coat. Deceased made no effort to place his hand on his pistol. When the gun was discharged, the defendant had advanced about forty yards upon the deceased, and the deceased had advanced about twenty yards upon the defendant.

Joseph Hill was the next witness for the State. He testified,

in substance, that, en route to the "Y" switch, on the morning of April 26, 1887, he met the defendant in his wagon, going from the said switch. Defendant, who had his shot gun with him, told witness that he had just shot but had not killed the deceased. He did not say why he shot deceased.

Will Taylor was the next witness for the State. He testified, in substance, that on the Sunday preceding the Tuesday of the homicide, he and George Henderson visited the house of the defendant, where they found the defendant and his family, and A. E. Parker and a young man named Crain. Soon after witness's arrival, defendant and the said Parker left the house together, and soon returned. The defendant then called to the witness, who went with him to a point a short distance from the house, where they had a short talk. When witness returned to the house, A. E. Parker asked him what the defendant had said to him. Witness replied that the "old man would settle the matter himself." The witness and Henderson remained at the defendant's house but a short time.

On the following morning the witness went with a wagon to a point on the "Y" switch and Temple mill road, where he had previously left a load of lumber, and, while loading it on his wagon, Dick Parker's wagon drove up. A. E. Parker, who was in that wagon, got into the witness's wagon and rode with witness to the "Y" switch and then back to the Temple mill, to get another load of lumber. En route from the switch to the mill, after giving witness a drink of whisky, A. E. Parker told witness that Tom Braden, the deceased, had been talking about witness's sister. The two then pursued their journey until they met the deceased with a load of lumber. Parker accosted the deceased and said to him: "I understand that you have reported that, at Jackson's party, you saw me with my knees between the legs of one of J. T. Melton's daughters." Deceased replied: "I said it." Parker said to him: "You are a G—d d—d lying son of a bitch. You have got that to take back or I will kill you." Deceased replied: "I can not take it back, for I can prove what I saw and said." Parker responded: "You will prove a d—d lie." At this time Parker had an open pocket knife in his hand. Deceased bent over as if he intended to start at Parker. Parker raised his knife, whereupon the deceased stopped and remarked: "You boys have got me foul." Parker put his knife in his hip pocket and pulled off his coat. Deceased started to leave, when witness, who had his knife out, caught his shirt collar and said: "Hold

4

on! We are not done with you yet." Deceased jerked loose and fled, leaving a piece of his shirt in the witness's hand. Witness pursued deceased about twenty feet, and cut at him once with his knife. Failing to overtake deceased, witness abandoned the pursuit, and he and Parker then went to defendant's house, which was off their road, to mill.

At a point about one hundred yards from his home, the defendant was seen attempting to catch a horse. Before reaching the house Parker hallooed to defendant: "D—n him, he says he said it; let's get our guns and go and kill him"—referring to the deceased. Defendant agreed, and he, Parker and witness started on to the house. En route, defendant proposed that, if witness would kill deceased, he and Parker would swear on trial that he did it in self defense. Witness refused. The parties then entered the house, where defendant got his shot gun and Parker a pistol. They then started up the road in pursuit of the deceased, with the declared intention of killing him. Mrs. Melton, the wife of the defendant, asked witness to follow and prevent the killing. Witness followed to prevent the parties from killing deceased if he could. When he overtook the parties, Parker ordered witness to go back. Defendant repeated the order, with a threat to shoot the witness if he did not go back. Witness turned back, and defendant and Parker rode on towards the mill. This was about eleven o'clock a. m. Some time later Parker returned to the house and said that the defendant was down the road and would kill deceased, and asked the witness to remain at the house and afterwards to join him in swearing to an alibi for the defendant, which witness declined to do.

Immediately after dinner the witness and Parker got into witness's wagon and went to the mill. Defendant had not yet returned to his house. Parker took his valise and fiddle with him. Upon arriving at the mill Parker went to John Foster's house and got a double barrelled shot gun. Foster asked him what he was going to do with the gun. He replied that the gun might kill a man before night. Foster replied to this: "Yes, a man's hog." Parker responded to this: "Yes, one that will weigh about one hundred and eighty pounds." Parker then went to the mill shed, stood the gun up against a tree and passed into the shed. He soon came out, got his gun and joined the witness at the wagon. Witness then observed the defendant on his horse near the door of Henderson's "commissary." He had his gun in his hands. He soon joined witness and Parker at the wagon, and

asked if either had yet seen the deceased; to which question they replied in the negative.    Looking around at this time, the witness saw the deceased at a lumber pile, about sixty yards distant. There was no obstruction of any kind between deceased and the defendant, witness and Parker, and there was no reason why the defendant could not then see deceased.    At this point of time Parker said to defendant:    "We had better put off killing Braden until some other day.    It won't do now; he has too many friends here."    After some further conversation the parties left the mill, Parker going with witness on his wagon, taking with him his valise, fiddle and the shot gun.    Before separating from witness at a point on the road about a half mile from the mill, Parker remarked that he would "kill Braden before the sun rose and set twice more."

Reviewing his testimony, this witness stated that, during the difficulty between himself, Parker and deceased, in the forenoon, he knew that Parker was armed with a pistol and a knife. Deceased had a whip in his hand at that time.    Some time subsequent to the killing of Braden, the defendant told the witness that, while he was at witness's wagon near Henderson's commissary, on Monday, the day before the killing, he saw Braden, who was then at the lumber pile, and that he would have killed him then but knew that Braden then had too many friends about the mill.    When Parker left witness, on the day before the killing, on the road, he left the shot gun in witness's wagon, to be taken to the mill and given to defendant, with directions to return it to the owner.    The witness was under indictment as an accomplice to this murder, and for assault with intent to murder Braden.    He was testifying under promise from the district attorney to dismiss both prosecutions against him.

Dick McDuff was the next witness for the State.    He testified, in substance, that he lived at the "Y" switch, and was at home at the time of the homicide.    He heard, but did not see, the fatal shot fired.    He repaired immediately to the place of the shooting, when he found the deceased lying on the ground, very weak from the loss of blood.    Defendant was then standing a few feet distant from deceased.    Witness had deceased taken to his house.    After he was put to bed, the deceased asked that all persons save the witness should leave the room.    When they had done so, deceased told witness to take his pistol from his coat pocket and keep it for him.    Witness got the pistol from the coat

pocket, where it was loosely carried. If any part of the pistol had worked through the lining the witness did not observe it.

Lon Dennis testified, for the State, in substance, that he was at Henderson & King's mill, otherwise known as the Temple mill, on Monday, the day before the killing of the deceased. While there he saw the deceased at one of the dry lumber kilns, loading a wagon with lumber. While he was thus engaged the witness saw the defendant ride up to the commissary and enter into a conversation with Mr. Tom Henderson. Thence he rode to the wagon of Mr. Will Taylor, where Taylor and A. E. Parker then were. There was no obstruction between the points where the wagons of deceased and Taylor were standing. The distance between them was not more than seventy-five yards, and there was no reason why defendant did not then see the deceased. Defendant was then armed with a double barreled shot gun. The witness could not say that defendant then saw the deceased, but, in going to Taylor's wagon, he rode towards the deceased, who, with a Mr. Bush, was then loading his wagon.

T. J. Henderson was the next witness for the State. He testified, in substance, that he was one of the proprietors of the mill known as Henderson & King's mill, or as the Temple mill. That mill was situated in Cass county, Texas, about three and one-half miles distant from the "Y" switch of the Texas & Pacific railway. The deceased, at the time of his death, was in the witness's employ, his business being to haul lumber from the mill to the switch. Between one and two o'clock p. m., on Monday, April 25, 1887, the day before the homicide, Will Taylor and A. E. Parker, riding in Taylor's wagon, arrived at the mill. Parker got out of the wagon near the witness's commissary store, and went to the house of John Foster, where he got a double barreled shot gun. When he came back Foster asked him what he was going to do with the gun. He replied that it might kill a man before night. Foster replied, "Yes, a man's hog." Parker replied: "A hog that will weigh about one hundred and eighty pounds." Parker then told Foster good bye and walked off toward the dry kilns, where Taylor was loading his wagon. About five minutes later the defendant, on horseback, and armed with a double barreled shot gun, rode up to the commissary store and bought a box of axle grease. He then rode off towards the dry kilns, where Taylor and Parker were then loading Taylor's wagon with lumber. Those kilns were in the direction of the sheds where the deceased kept

his mules.   Braden usually got his second load of lumber be-. tween one and two o'clock p. m.   Deceased was about twenty-five years old, and weighed about one hundred and eighty-five pounds.

N. Bush testified, for the State, that he was at the mills at about two o'clock on Monday, the day before the homicide.   He and deceased were at the dry kiln, near the shed, loading deceased's wagon, when defendant, armed with a shot gun, rode up to the commissary store, and thence to the wagon at which Taylor and Parker were at work.   Taylor's wagon and deceased's wagon were then about sixty yards apart.   The witness knew as a fact that the deceased saw defendant on that occasion.   While he could not testify that the defendant saw the deceased, he could imagine no reason why he did not, as he rode directly toward witness and deceased, over perfectly clear and unobstructed ground.   Witness and Braden changed work that evening, the witness driving that load to the switch for Braden.

George Henderson testified, for the State, that on Sunday, the second day preceding the homicide, he and Will Taylor went to the defendant's house, where they found the defendant, his family, A. E. Parker and Jesse Crain.   Soon after their arrival defendant and Taylor left the house together, engaged in a short private conversation, and then returned.   On the return of the parties, Parker asked Taylor what the old man, meaning defendant, said to him.   He replied: "He says he will settle it himself."   This private conversation between defendant and Taylor was preceeded by a short private conversation between Parker and Taylor.   Witness heard neither of the conversations alluded to.   Witness and Taylor left defendant's house together at about nine o'clock on that evening, leaving Parker there.

On the next night, which was Monday, the night preceding the homicide, the witness saw Will Taylor at Henderson & King's commissary store, near the mill.   Taylor then had a large stick in his hand.   Witness remarked to him: "You must be going to do some fellow up with that big stick."   Taylor replied:   "I am going to knock Tom Braden on the head if he comes out of that commissary, and, if necessary, I know where to get my shot gun; it is not more than twenty steps off." Deceased was then in the commissary store.   Previous to that time, Parker, in the presence of witness, loaned a gun to J. W.

Foster, and told Foster to give the gun to the defendant when he got through wolf hunting with it. The State rested.

Wyatt Alexander was the first witness introduced by the defense. He testified, in substance, that he was present at the "Y" switch of the Texas & Pacific railway at the time of the homicide. At the time of the shooting the witness was engaged in loading one of the box cars of the said railroad with lumber. He saw the defendant get off his wagon near the switch, and start towards the deceased, who was then unloading a wagon at another point not far from the switch. Witness then observed that the defendant and the deceased were then advancing upon each other, the defendant armed with a shot gun. Defendant said something to deceased which witness did not understand. Deceased then dropped down behind a lumber pile. Defendant continuing to advance, deceased came out from behind the lumber and started towards the defendant. When the parties approached within about fifteen feet of each other, defendant called to deceased not to approach any closer. Witness then turned his back and the gun fired. Witness then ran to the parties, and found Braden lying on the ground, shot through the left leg. He then saw a pistol in Braden's coat pocket. The muzzle had worked through a torn place in the lining of the coat, and was plainly visible. On that morning, some time before the shooting, Braden told witness that if he saw a man with a gun about the switch during the day, to keep his eye on him. On that same morning Will Taylor was at the switch with a gun, which he left with Dick McDuff.

Joe Hill was the next witness for the defense. He testified, in substance, that, about a week before the homicide, and shortly after a certain party at the house of one Jackson, he had a conversation with Braden about one of the daughters of defendant. That conversation occurred on the lumber road, about three-fourths of a mile from defendant's house. Braden said that he attended Jackson's party and detected A. E. Parker and one of the Melton girls in a compromising position; that during the night he saw Parker in Jackson's dining-room wallowing over one of the Melton girls; that they sat facing each other, Parker with his knees between the girl's knees. Witness asked deceased why he talked in that manner of Melton's family. He replied that he did not like the "God d—d stock." The witness repeated this conversation to Melton at about nine o'clock a. m., on Monday, the day preceding the homicide. Melton had previously heard

of Braden's statements about his daughters, and asked witness if Braden had ever made them to him. Will Taylor and A. E. Parker asked witness about Braden's statements to him concerning the girls, but witness said nothing to them about it. Witness saw Braden on the morning of and before the killing. Braden then told witness that he had not seen old man Melton since he heard, a few days before, of Melton's threats to kill him about his statement concerning the girls.

Lon Jenkins testified, for the defense, that he attended a party at T. J. Hendersons's house in January, 1887. While dancing with Miss Addie Melton, at the head of a set near the door, the deceased, who was standing in the door, said to witness: "Lon, she is too fast to be decent," referring to Miss Addie Melton. This occurred at about nine o'clock.

Miss Addie Melton, the daughter of the defendant, corroborated the testimony of the witness Jenkins, declaring that, while dancing with Jenkins at Henderson's party, she distinctly heard Braden say to Jenkins: "Lon, she is too fast to be a decent girl." On her return home that night, witness told her mother what deceased said about her, but did not tell the defendant at that time, fearing that she would precipitate a difficulty between him and Braden. She, however, told him on the day before the killing, having ascertained that he had been informed of other slanders uttered against her by deceased.

Mrs. Melton, the wife of the defendant, was his next witness. She testified that Taylor and Parker came to her house on Monday, the day before the killing, and told her, Taylor doing the talking, that they had met the deceased on the lumber road, and that deceased said that he saw Parker, at Jackson's party, sitting with his knees between the knees of one of her daughters. Defendant soon came in, when Taylor related the same thing to him. When Taylor left the room the witness and defendant proceeded to talk the matter over. Witness begged defendant to pay no attention to what Will Taylor had said, inasmuch as he was unworthy of belief, was a mischief maker, and in the habit of traveling over the country, telling lies and getting people into difficulties. Witness's advice seemed to anger the defendant. The witness emphatically denied that defendant and Parker left the house to pursue Braden on that day, or that she sent or asked Taylor to follow and bring them back. She did not know at what hour defendant left home that day, nor

whether he left at all or not, nor whether he rode or walked, nor whether or not he took his gun.

Mrs. Baughman, the sister of Mrs. Melton, and the aunt of the Melton girls, was the defendant's next witness. She testified that she attended the Jackson party with her neices as their chaperone. She took a great pride in her neices. Their deportment on that and all other occasions was conspicuously proper and modest, and their general carriage and behavior had never been excelled by any lady of the witness's acquaintance. The dining room in Jackson's house, in which it was reported that Braden discovered Parker and Addie Melton in a compromising situation, was a side room in which a light was kept burning throughout the night. The room stood open all night, and the guests were continually passing in and out of the said room, partaking of the supper therein spread.

J. A. Culpepper was the next witness for the defense. He testified that he boarded at the house of the defendant in April, 1887. On the eighteenth day of that month he went to the "Y" switch, to see about the inspection of some ties. While there he met Braden for the first time. He asked Braden if he had seen the tie inspector on that morning. Braden replied that he had not, and asked witness if he was not one of the men who boarded at Melton's, and if he knew one Culpepper. Witness replied that his name was Culpepper and that he boarded at Melton's. Braden then remarked: "I suppose you know the Melton girls?" Braden then said: "Well, they remind me, more than anything else, of bags of ——" (using a vulgar term for excrement). After this the witness got on Braden's wagon and rode with him as far as he went towards Melton's house. On the road, Braden made to the witness substantially the same statement he made to Taylor about the conduct of Parker and Addie Melton at Jackson's party, and added that he talked about Melton's people because they were not respectable, and that his reason for believing them to be not respectable was that they were not visited by respectable people. Witness was at Melton's house at the time of the shooting. He did not know when Melton left home to go to the switch on the morning of the shooting. When Melton came home after the shooting, he told witness that he had shot Braden, and asked witness to haul his remaining load of ties to the switch for him, which the witness did. It was not until after the killing that witness told Melton of Braden's statements about his daughters.

John Dana and Bill Bryant were respectively introduced as witnesses for the defense. They testified that they attended the Henderson party in January, 1887, and saw and talked with Braden at that party.

At this point the defense rested.

T. J. Henderson, recalled by the State, testified, in rebuttal, that the only party at his house ever attended by the Misses Melton was the party given by him in January, 1887. Witness saw Braden on the evening of that party, invited him to attend, and gave him a written invitation for the family of his step-father, Parson Harrison. Braden was then dressed in his work day clothes. When Braden returned to the mill from his step-father's house, late on that evening, he still had on his working clothes, from which fact the witness concluded that he had decided not to attend the party. Braden left again about dusk, going towards his step-father's house, a mile distant, and witness did not see him again until next morning. Witness attended the party, mixed with the people in the house and outside, at the commissary and at the mill, and if Braden was about the place on that night he did not see him. He could probably have been there, though not seen by witness. Witness knew Braden well. He had never heard Braden use an oath.

Buck Parker testified, for the State, in rebuttal, that he and Braden roomed together in Henderson & King's mill, in January, 1887. Braden took his meals at his step-father's house, except his dinner, which he always brought with him from breakfast in a tin bucket. Witness did not attend the party at Henderson's in January, but was at the door once at about nine o'clock on that night. He saw the Melton girls there, but did not see Braden. Braden left the mill about dusk on that evening, to go to his step-father's. Witness next saw him when he came to work on the next morning, with his bucket of grub on his arm. Witness had never heard Braden use an oath.

Parson Harrison, the step father of Braden, testified, for the State, that he did not approve of dancing parties, and never permitted any member of his family to attend one. He remembered the party at Henderson's, in January, 1887. He knew as a positive fact that Braden did not attend that party. On the contrary, he came to witness's house about dusk on that evening, and did not leave it again until after breakfast on the next morning. Witness had never heard Braden use an oath.

Pate Murph testified, for the State, that he knew the reputa-

tion of the Melton girls for chastity and virtue. It was bad, and was bad for two years prior to the Jackson party. Witness had heard several persons speak of the reputation of the girls, but could recall only the names of Mr. Patrick, Mr. Frances and Ab Gholson. He knew of no particular act of unchastity committed by them, nor could he recall that he ever heard of a specific act of unchastity. Gholson once told witness that Baughman once told him that one of the Melton girls wallowed all over him. On one occasion the witness saw one of the girls in Atlanta, Texas, with Ed Stewart. Stewart was then too drunk to walk straight, and the Melton girl was helping him along.

J. W. Frances testified, for the State, that the reputation of the Misses Melton for chastity was bad. He had often heard their reputations pronounced bad, but could remember the name of only one of his informants, his daughter, now living in Western Texas, who told him that at Jackson's party she saw Parker sitting in front of Addie Melton with his knees between hers. Independent of these reports, the witness could pronounce the girls to be of bad character only from the fact that they were notoriously bad behaved girls at church, and attended church at night with young men.

Theophilus Piles testified, for the State, that the reputation of the Melton girls for chastity was bad. He could not recall the name of any particular person he had heard say so, but knew the fact to be neighborhood talk. Once at singing school, Addie Melton told the witness that she and Parker were in the habit of biting each other; that she would bite Parker one morning, and Parker would bite her the next; that she forgot to bite Parker on one particular morning, and on the following morning bit him so hard that she broke a tooth. Respectable people did not visit the Meltons. The witness did visit them. He had nothing to do with the question of his sister visiting them; "the old man controls her." Witness would not testify that the Melton girls were not virtuous.

Mr. Patrick testified, for the State, that the reputation of the Melton girls for chastity was bad. He could not name any one person he had ever heard say so. On one occasion the girls and Parker visited witness's house. One of the girls stood up in a swing and had the swing propelled towards Parker, who stood in front of her. She would kick at him, and he would catch at her feet. Afterwards Parker and the girl sought a seat on a log.

They amused themselves by pinching each other in the sides, on the legs and on the thighs. Witness could not swear that the girls were not in fact virtuous.

Harrison Daniels and Parson Dougherty testified that the reputation of the Melton girls for chastity and virtue was bad, but based their opinion only upon their bad behavior at church.

The State closed.

P. Frazier and Mr. Jackson testified, for the defense, that so far as they knew, or had ever heard, the Melton girls sustained an irreproachable reputation for chastity and virtue until the circulation of the report concerning the conduct of one of them at the Jackson party.

Ab Gholson testified, for the defense, that what he said to the State witness Pate Murph about young Baughman's statement about the Melton girl was said in the presence of his family, and with no purpose to reflect upon the girl. What he did say to Murph was that Baughman, a weak minded boy, meaning nothing he said, remarked to him that he had a nice time with the Melton girl on a certain journey in a wagon; that the wagon was small, crowded them, and in speeding over the road jolted him and the girl together.

In his motion for continuance the appellant alleged that he expected to prove by one witness that he did not see Braden on Monday, the day before the killing, and that the killing occurred on the first meeting with deceased after being informed of the insulting language. That by another witness he expected to prove that, on the day previous to the killing, Braden exhibited a pistol with which he declared his intention to kill the appellant if the latter said anything to him about his statements concerning his daughters. That by two other witnesses he expected to prove that, when the fatal shot was fired, the deceased was advancing upon appellant, making at the same time strenuous efforts to draw his pistol, and that appellant twice ordered him to desist before firing the fatal shot.

The motion for new trial raised the questions discussed in the opinion.

*O'Neal & Son*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. All the evidence adduced in this case goes to show that the homicide was occasioned by and was

the result of insulting and defamatory statements made by the deceased about the daughters of defendant. Defendant himself claimed that this was the sole cause and occasion of the killing, and, if any fact in the transaction is clearly established, it is that after being informed of the defamatory language appellant declared his intention to kill deceased, and having made his preparations to do so, started from home for the purpose of putting them into execution. On the first day when he was seeking deceased for that purpose, it is reasonably made to appear that he saw him, and under circumstances in which he might easily have made the effort, and perhaps have accomplished his vengeance; but he did not do so. On the following day he again went to the place of the homicide, for the avowed purpose of finding and killing the deceased, and there can be no question but that he provoked the altercation, if there was one, which immediately led to the killing.

Under these facts the homicide could not have been manslaughter, because he did not kill him when he first met him, or had an opportunity to kill after having been informed of the insult. (Penal Code, sub div. 4, arts. 597, 598; Howard v. The State, 23 Texas Ct. App., 265.) And again, not having killed on the first meeting and opportunity, the crime was not manslaughter, because the second meeting and contest was sought, brought about and provoked by defendant, with apparent intention and for the purpose of killing deceased. (Penal Code, art. 603; Greene v. The State, 12 Texas Ct. App., 445.)

With greater reason it may be asserted that there is not the slightest pretense of self defense legitimately raised by the facts; on the contrary, they clearly, if not absolutely, negative such defense. Such being the case, even if we concede proper diligence to obtain the absent testimony for which the continuance was sought to prove self defense, still we would be forced to hold, in the light of the indubitable facts established, that said testimony would not be probably true. We see no error in the ruling of the court upon the application, and the refusal of the new trial in so far as it was based upon it.

Serious complaint is made of the charge of the court. In our opinion it is a most able and lucid exposition of the law upon all the legitimate phases of the facts. No material reversible error has been presented on this appeal, wherefore the judgment is affirmed.                                    *Affirmed.*

Opinion delivered October 22, 1887.